UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-276 (DSD/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | GOVERNMENT'S POSITION ON |
| v. ) | SENTENCING |
| ) | |
| VICTOR MANUEL QUIJADA, ) | |
| ) | |
| Defendant. ) | |

COMES NOW the United States of America, by and through its undersigned attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Thomas M. Hollenhorst, Assistant United States Attorney, and submits the following position on sentencing concerning the defendant, Victor Manuel Quijada. The government asks the Court to impose a sentence that includes a term of imprisonment in the range of 324 to 405 months.

Procedural History

On October 31, 2019, the defendant was charged in an Indictment with two counts of distributing 50 grams or more of actual methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). ECF 12. On January 30, 2020, he pleaded guilty to both counts of the Indictment without the benefit of a plea agreement. ECF 28.

The Nature and Circumstances of the Offense

On August 1, 2019, a police undercover officer ("UC") met with the defendant in the Twin Cities to purchase methamphetamine. ECF 40 ¶ 13. While they waited for a courier to deliver the drugs, the two talked about the drug trade and how law enforcement

was shutting down other drug operations.  *Id.*  To avoid law enforcement scrutiny, the defendant said that he changed his telephone number every 30 days and only purchased "flip phones" that did not have internet capability.  *Id.*  When the courier arrived, the defendant met with him, obtained the drugs, and then handed the UC .435 kilograms of actual methamphetamine in exchange for $5,000.  *Id.*

On August 14, 2019, the UC purchased another .424 kilograms of actual methamphetamine from the defendant for $4,900 at a Menard's parking lot in the Twin Cities.  ¶ 8.  While waiting for the courier to arrive with the drugs, the defendant spoke about drugs and how much he had sold.  *Id.*

On September 4, 2019, the UC again met with the defendant in Minneapolis, Minnesota, and purchased .444 kilograms of actual methamphetamine from him for $4,800.  ¶ 9.  While waiting for the courier to arrive, the defendant discussed a prior drug purchase involving the courier that had gone awry.  *Id.*  The defendant said that he was armed at the time due to the amount of money and drugs involved.  *Id.*  The defendant said that after the courier took the buy money, he held the courier's cousin as "collateral." *Id.*  When it appeared that the courier might not return with the money or drugs, the defendant displayed a firearm and threatened the courier's cousin with it.  *Id.*  The defendant told the UC that the courier eventually returned with the money.  *Id.*

On September 22, 2019, the defendant was apprehended after a traffic stop.  ¶ 10. The defendant refused to identify himself and was arrested for obstructing legal process. *Id.*  During a search of the vehicle, officers found a small container in the glove box containing baggies with approximately .088 kilograms of marijuana.  *Id.*  The officers

2

found a loaded P80 Glock pistol in the trunk of the vehicle and two cell phones and $3,206 on his person.  *Id.*  The defendant denied that the firearm was his.  *Id.*

Since his arrest, several people have been interviewed in connection with the defendant's drug trafficking activities.  One person ("Informant 1") said that he[1] was introduced to the defendant two years ago and that the defendant supplied him with up to 10 pounds of methamphetamine per week.  ¶ 15.  Informant 1 said that he would often meet him at Rudy's Tire Company in Saint Paul to conduct the transactions and, on one occasion, met him at the defendant's girlfriend's apartment.  *Id.*  Informant 1 said that the defendant's brother, Bernardo Flores, Jr., worked for the defendant and collected money from Informant 1 on occasion.  *Id.*[2]

Informant 1 said that he was originally recruited by the defendant as a drug courier and made numerous trips from Saint Paul to Phoenix to pick up methamphetamine.  *Id.*  These trips often began at a house with a detached garage in Saint Paul.  *Id.*  While at the garage, a "mechanic" would hide money in the fuel tank of the load vehicle.  *Id.*  After Informant 1 returned from Arizona, the "mechanic" would remove the methamphetamine from the fuel tank.  *Id.*  Informant 1 said that he believed that the defendant also personally made several trips to Arizona to obtain methamphetamine.  *Id.*  Informant 1

---

1. Masculine pronouns are used to describe the informants without regard to their true gender.

2. Flores was later indicted in this district on drug trafficking charges and absconded after being released on conditions of bond.  *See United States v. Bernardo Flores, Jr.*, Criminal No. 19-273(2) (JRT/BRT).  He is believed to be living in Mexico with several other fugitives who have been charged in Minnesota courts.

said that he had seen as many as 400 pounds of methamphetamine in connection with these trips.  *Id.*

Informant 1 and his friend ("Informant 2") met in November of 2018 at a party in Rochester, Minnesota.  ¶ 16.  Thereafter, Informant 2 drove Informant 1 to Saint Paul on multiple occasions to purchase large amounts of methamphetamine from the defendant. *Id.*  Informant 2 said that in January 2019 while at Rudy's, Informant 1 purchased up to five pounds of methamphetamine from the defendant for $3,200 per pound.  *Id.*  In January 2019, Informants 1 and 2 made a trip to Arizona.  *Id.*  The defendant directed them to rent a vehicle and bring it to Rudy's.  *Id.*  While there, an unknown person picked it up and then returned it a few hours later.  *Id.*  While they waited, they sat with the defendant who told them to use the "Telegram App" on their phone during the trip to Arizona to communicate with an unknown man in Mexico, whom the defendant referred to as his "cousin."  *Id.*  Informants 1 and 2 said that Bernardo Flores, Jr., accompanied them on their way to Arizona, which was confirmed by hotel records.  *Id.*  While at a hotel in Phoenix, an unknown person took the load vehicle and returned it later.  *Id.* Informants 1 and 2 then drove the load vehicle back to Minnesota where it was unloaded. *Id.*

In April 2019, Informants 1 and 2 traveled to Arizona to obtain a large quantity of methamphetamine on behalf of the defendant and others.  ¶ 18.  Electronic surveillance revealed that Informant 1 returned by airplane to Minnesota on April 20, 2019, and that Informant 2 was in Arizona with a rented truck.  *Id.*  On May 1, 2019, the police saw Informant 2 arrive in Minnesota.  *Id.*  A search of the truck the next day resulted in the

4

seizure of 25.4 kilograms of methamphetamine hidden in the fuel tank (4.93 kilograms of were analyzed and determined to be 4.63 kilograms of actual methamphetamine). *Id.*

The Criminal History of the Defendant

The defendant is no stranger to the criminal justice system. In addition to a juvenile record which includes adjudications for disorderly conduct, providing false information to the police, and fleeing from a police officer in a motor vehicle, the defendant has numerous adult convictions including obstructing legal process (two times), domestic assault by the infliction of bodily harm (two times), underage consumption of alcohol, possession of marijuana (two times), possession of a controlled substance, second-degree murder, and over a dozen vehicle-related offenses. ¶¶ 43-71.

The defendant's penchant for violence is well-documented. At the age of 15, he punched a rival gang member for having "gone after" the defendant's fellow Surenos-13 gang members. ¶ 43. Six months later, he and five other Surenos-13 gang members pushed a seven-year-old child off of his bicycle and stole it. ¶ 44. At the age of 17, the defendant got into a high-speed chase with a police officer and had to be removed from the stolen vehicle at gunpoint. ¶ 46. When the defendant was 19 years old, the police spotted him at the scene of an aggravated assault holding a bat. ¶ 50. When an officer approached him, he raised the bat and then dropped it and ran away when the officer drew her weapon. *Id.* A month later, the defendant punched his girlfriend in the left eye with a closed fist in the presence of their 13-month-old son. ¶ 52.

At the age of 20, the defendant and another man brutally chased down and murdered a young man in retaliation for an earlier incident. ¶ 56. The defendant and his

accomplice knocked the victim to the ground, punched and kicked him, and repeatedly struck him in the head with a large stone. *Id.* The accomplice then used a knife to cut the victim's face and the defendant then stabbed him to death in the chest. *Id.* While serving time for this offense, the defendant received multiple correctional violations for possessing contraband, interfering with security procedures, lying, smuggling, using intoxicants, and failing to comply with directives. *Id.* After his release, the defendant violated the terms and conditions of his supervision approximately seven times and was returned to prison after absconding. *Id.*

The defendant's latest domestic assault offense occurred during Christmas 2016. ¶ 65. He accused his girlfriend of being unfaithful and then destroyed the Christmas tree, slapped her in the face, and hit her on the head with a ceramic bowl. *Id.* When the girlfriend grabbed their young son and attempted to defend herself, the defendant broke a dresser drawer, threatened her with a piece of the drawer, and then grabbed a knife stating, "Let's kill each other right now." *Id.* The defendant then grabbed his girlfriend by the throat and pushed her against the wall before leaving. *Id.*

Despite his violent past, the defendant has been credited with only six criminal history points. ¶ 72. This places him in criminal history category III. ¶ 73.

Guideline Range and Sentencing Recommendation

The probation office has determined that the defendant has a total offense level of 39, a criminal history category of III, and a guideline range of 324 to 405 months. ¶ 102. The offense level of 39 results from a base offense level of 38 (4.5 kilograms or more of actual methamphetamine), adjusted upward by four levels for role in the offense, and

reduced by three levels for acceptance of responsibility. ¶¶ 26, 33, 37-39. The government reserves the right to contest the three-level reduction for acceptance of responsibility and to ask for a two-level enhancement for obstruction of justice if the Court accepts the factual findings of the PSI and the defendant continues to deny these facts as he did so in his sentencing position. *See* ECF 44.

## The Mandatory Minimum

The defendant claims that he is not subject to a 15-year mandatory minimum under 21 U.S.C. §§ 841(b)(1)(A) and 851(a) as a result of his prior second-degree murder conviction. While it is a close call, the government hereby withdraws the argument that a 15-year mandatory minimum applies and asks the Court to sentence the defendant as if Count 1 carried a 10-year mandatory minimum.

## The Guideline Factors

The defendant objects to the base offense level of 38 and the four-level enhancement for his role in the offense. The facts underlying the defendant's criminal misconduct belie these objections. The government will call Special Agent Andy Mento from the FBI at the sentencing hearing to summarize the defendant's misconduct and to present evidence establishing that the defendant was an organizer and leader of a criminal enterprise that was responsible for the distribution of hundreds of pounds of methamphetamine. This evidence will include the information provided by Informants 1 and 2, which will support a base offense level of 38 and the four-level role-in-the-offense adjustment for the reasons stated by the probation office. *See* ECF 40 Add. ¶¶ 1-2.

The defendant's argument concerning the alleged disparity between pure methamphetamine and the mixture weight of methamphetamine is academic in light of the vast quantities of methamphetamine involved in the defendant's drug trafficking activities. The evidence will show that the defendant was responsible for distributing well over 45 kilograms of methamphetamine which, regardless of purity, results in a base offense level of 38.  *See* USSG § 2D1.1(c)(1).   In any event, the government opposes a variance on this ground for the reasons articulated in several prior sentencing positions.  *See, e.g., United States v. Rodolfo Alonso Portillo*, Criminal No. 18-189(5) (DWF) [ECF 290].

<u>The History and Characteristics of the Defendant</u>

The defendant is 36 years old and was born in Los Angeles, California. ECF 40 ¶ 77.   He has one brother who is currently serving a 32-year prison term for murder.  *Id.*   He also has four maternal half-siblings, two of whom have been indicted in this district for drug trafficking.  *Id.*   His mother sent the defendant to live in Minnesota when he was 14 years old to get him away from his Surenos-13 gang activities.  ¶ 78.  In spite of this, his gang involvement continued through the date of his most recent arrest.  ¶¶ 78, 80.  The defendant has had a tumultuous relationship with the mother of his three children punctuated by numerous domestic assaults.  *See* ¶¶ 80-81.

The defendant is in good physical condition despite a stabbing incident in 2002, a pinched nerve in 2007, and wounds suffered from a physical altercation in 2009.  ¶ 87. He apparently does not have any mental or emotional health issues.  ¶ 88.  He has a history of using illegal drugs.  *See* ¶ 89.   He was twice expelled from high school, but managed to earn his GED in 2002.  ¶ 91.   The defendant has some history of employment

8

despite his many years behind bars, but he does not appear to have the ability to pay a criminal fine.  ¶¶ 93-100.

## The Needs of Sentencing

This case is aggravated by the very serious nature of the charges (which involved an ongoing conspiracy to distribute large amounts of methamphetamine), the defendant's leadership role in the drug enterprise, and the defendant's particularly violent criminal history.  There is little to say by way of mitigation, save for the significant criminal misdeeds of various family members, which may have contributed to the defendant's sense of lawlessness.  For these reasons, the government asks the Court to impose a sentence that includes a term of imprisonment within the guideline range of 324 to 405 months. This sentence would serve the needs of sentencing to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to avoid unwarranted sentencing disparities among defendants.

WHEREFORE, the government asks this Honorable Court to impose a sentence that includes a term of imprisonment in the range of 324 to 405 months.

Dated:   July 16, 2020               Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

s/*Thomas M. Hollenhorst*

BY: THOMAS M. HOLLENHORST
Assistant United States Attorney
Attorney ID No. 46322

9